UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATIRIA IVETTE GONZALEZ,

          Plaintiff,

                                      **DECISION & ORDER**

v.                                 15-CV-6216

CAROLYN W. COLVIN,

          Defendant.

---

## Preliminary Statement

Plaintiff Katiria Gonzalez ("plaintiff") brings this action pursuant to Title II and Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings. See Docket ## 6, 9.

## Procedural History

On November 14, 2011, plaintiff applied for supplemental security income. Administrative Record ("AR") at 144-49, 179. The Social Security Administration issued a Notice of Disapproved Claim on August 16, 2012. AR at 57-59. Plaintiff then timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR at 69-70. On December 4, 2013, ALJ John P. Costello conducted

a hearing on plaintiff's claim.  AR at 20-41.  On January 29, 2014, the ALJ issued a decision, therein determining that claimant was not disabled under the Social Security Act.  AR at 8-16.  Plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council.  AR at 4.  On February 13, 2015, the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner.  AR at 1—3.  This federal lawsuit followed.

## Relevant Educational and Medical History

In her application for disability benefits, plaintiff reported that her capacity to work was limited by her learning disability and, in particular, her difficulty with math, reading, and writing.  AR at 183.  Though plaintiff was employed part-time when she filed her application, she alleged that her condition first bothered her on August 12, 2010.  Id.

Educational Records: Due to the nature of plaintiff's impairments, the record below contains a number of reports from her educational record.  On September 27, 2010, plaintiff was evaluated by Rhonda Korn, a certified school psychologist with the Rochester City School District.  AR at 340-43.  According to the report on the evaluation, plaintiff was first classified as having a learning disability in the second grade.  AR at 340.  She struggled academically and required individual assistance in school.  Id.  At

2

the evaluation, she appeared friendly and cooperative, and reported having friends and a boyfriend with whom she lived. AR at 341. Her cognitive abilities were average, but she demonstrated significant difficulty with academic tasks. AR at 342. She had borderline deficient spelling and reading skills – functioning at a fourth or fifth grade level – and deficient math skills – functioning at a second or third grade level. Id. She had trouble counting money and telling time, conditions that the psychologist opined would make it difficult for her to live successfully on her own. Id.

On March 4, 2011, the Rochester City School District provided plaintiff with an Individualized Educational Program ("IEP"). AR at 234-42. The IEP called for significant accommodations and noted that she had particular difficulty with reading comprehension and spelling. AR at 236-37. The report also noted that plaintiff had attendance problems at school due to personal issues with her family and boyfriend. AR at 237-38. She reportedly interacted well with peers and adults, but had difficulty coping with stress. AR at 238.

On January 30, 2012, plaintiff was evaluated by another school psychologist, Gary Kleiman. AR at 279-83. At that time, she was enrolled in a program for students with special learning needs and continued to struggle academically. AR at 279. According to the report on the evaluation, plaintiff was functioning within the overall borderline range of intellectual development and abilities. AR at

3

281. Her working memory and processing skills were significantly impaired: she required ample time to process new information and had significant difficulty retaining new information. AR at 282. She required extensive repetition to remember information and had difficulty expressing newly learned material. AR at 282. Her academic skills were very low, particularly in math. Id. Accordingly, Kleiman remarked that plaintiff would likely only graduate high school with an IEP diploma and recommended extensive accommodations. AR at 283. He opined that she had very significant difficulties with her working memory and expressive language skills. Id. He also concluded that plaintiff, who hoped to be a pediatrician, would be better suited pursuing a career in child care. Id.

An additional IEP was created for plaintiff on February 8, 2012. AR at 284-92. The IEP noted that plaintiff was making "very little progress" and failed all of her classes due to poor attendance. AR at 285. Her math, reading, and writing skills were all below grade level. Id. Though she interacted well with others, the IEP noted that she had difficulty dealing with personal stress. AR at 286. Overall, she would require continued academic support, including structured environments and close relationships with her instructors. Id. At some point before May 17, 2012, however, plaintiff withdrew from school without receiving a diploma. AR at 357.

Medical Records: Plaintiff was seen by Dr. Christine Ransom,

4

Ph.D., for a consultative psychiatric evaluation at the behest of the Social Security Administration on August 10, 2012. AR at 359-62. Plaintiff reported that she had completed the eleventh grade and that she had been working sixteen hours per week making pizza at a restaurant for approximately a year. AR at 359. She had no noteworthy psychiatric or medical history and denied all mental health deficits except for her learning disability, which she claimed made it difficult for her to read and write. Id.

On examination plaintiff was cooperative and socially appropriate. AR at 360. Dr. Ransom noted that plaintiff's speech was slow and that her expressive skills were "simplified but adequate to complete the evaluation without difficulty." Id. Her thought process was coherent and goal-directed and her attention and concentration were intact. Id. Her immediate memory was mildly impaired by her limited intellectual functioning, which appeared to be in the borderline range. AR at 360-61. She could care for herself, but had difficulty managing money and was unable to drive. AR at 361. Additionally, Dr. Ransom opined that plaintiff could: follow and understand simple directions and instructions; perform simple tasks independently; maintain attention and concentration for simple tasks; maintain a regular schedule; and learn simple new tasks. AR at 361. Plaintiff would have mild difficulty performing complex tasks, but could adequately relate with others and deal with stress. Id.

5

Accordingly, Dr. Ransom diagnosed plaintiff with "probable borderline intellectual capacity" and provided no recommendations. Id. She opined that plaintiff's prognosis was fair, but found that she would be unable to manage her own funds. Id.

State agency psychological consultant Edward Kamin, Ph.D., also reviewed plaintiff's medical records and provided his own report on August 15, 2012. AR at 45-53. He described plaintiff's impairment as severe borderline intellectual functioning and noted that she had a moderately limited ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances. AR at 48, 50. Additionally, he opined that plaintiff had a markedly limited ability to understand and remember detailed instructions. AR at 50. Accordingly, he determined that plaintiff had the capacity to do simple, unskilled work and was not disabled. AR at 50-52.

## Hearing Testimony

Testimony of Plaintiff: On December 4, 2013, plaintiff appeared before ALJ John P. Costello with her representative, Justin Goldstein. AR at 20-41. Plaintiff's representative described her as a young individual with marginal educational levels. AR at 24. He outlined

6

plaintiff's academic struggles and argued that her difficulties in
school would translate to difficulties at work.    AR at 24-25.
Plaintiff then testified that, at the time of the hearing, she was
twenty-one years old.   AR at 25.   Though she was unemployed, she said
that she previously worked two days per week making pizza at a
restaurant.   AR at 25-26.   She worked there for approximately one year
before leaving to care for her son.   AR at 26.   The ALJ determined
that this did not qualify as past relevant work.   AR at 27.

Plaintiff also testified that she did not drive and relied on
her friends and family members to get places.   AR at 28.   She said
that she would be unable to work a full-time job because she had
difficulty "keep[ing] up" with her coworkers.   AR at 29.   She also
testified that she and her boyfriend's mother were the primary
caregivers for her son, and that her boyfriend's family supported
her.   AR at 31-32.   Plaintiff testified that she could not live on
her own, mostly because she required help with her son.   AR at 35.

Testimony of the Vocational Expert: Vocational Expert ("VE")
Julie Andrews also testified at the hearing in response to a series
of hypotheticals posed by the ALJ.   AR at 36.   First, he asked Andrews
what unskilled occupations existed for a person with the same age,
education, and work experience as plaintiff, and who was limited to
performing simple repetitive tasks.   AR at 37.   Andrews explained
that such an individual could work as an industrial cleaner or a hand

7

packager – both unskilled positions requiring medium exertion. AR at 37. The training for these positions, the VE added, would be both verbal and demonstrative. AR at 39-40. Next, the ALJ asked what unskilled work existed for the same individual with the additional limitation that they could only hold level one reasoning positions. AR at 38. Andrews said that such an individual could work as a housekeeper or a cleaner – both unskilled positions. Id. Third, the ALJ asked what unskilled work existed for the same individual with the additional limitation that they would need to be verbally reminded of work tasks every thirty minutes by a supervisor. Id. The VE said that such an individual would not qualify for competitive employment. AR at 39. The VE also stated that any training required outside of the normal training period, meaning beyond the first thirty days of employment, would qualify as a special circumstance. AR at 40.

### Determining Disability Under the Social Security Act

The Evaluation Process:  The Social Security Act provides that a claimant will be deemed to be disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that [s]he is not only unable to do [her] previous

8

work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920.  Plaintiff bears the burden of proving her case

at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental

10

impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ first found that plaintiff had not engaged in substantial gainful activity since November 14, 2011, her application date. AR at 10. At the second step, the ALJ found that plaintiff had severe borderline intellectual functioning. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment that rendered her disabled. AR at 17-19. Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the residual functional capacity ("RFC") to perform her past work, notwithstanding her severe impairment. The ALJ concluded that plaintiff had the RFC to perform "a full range of work at all exertional levels," but was limited to work requiring no more than level one reasoning ability. AR at 12.

Since plaintiff had no past relevant work, the ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age, education, and previous work experience. AR at 14-15. The ALJ next determined whether jobs existed in the national economy that a person having plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). After considering all of the evidence of record, the ALJ found that plaintiff could perform the work of a housekeeping cleaner and a cleaner. AR at 15. Accordingly, the ALJ found plaintiff not disabled. Id.

### Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine de novo whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as

12

a reasonable mind might accept as adequate to support a conclusion."
Brault, 683 F.3d at 447—48 (internal citation and quotation marks
omitted). "Even where the administrative record may also adequately
support contrary findings on particular issues, the ALJ's factual
findings must be given conclusive effect so long as they are supported
by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.
2010) (internal quotations omitted).

This deferential standard of review does not mean, however, that
the Court should simply "rubber stamp" the Commissioner's
determination. Even when a claimant is represented by counsel, it
is the well-established rule in our circuit that the social security
ALJ, unlike a judge in a trial, must on behalf of all claimants
affirmatively develop the record in light of the essentially
non-adversarial nature of a benefits proceeding." Moran v. Astrue,
569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198
F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits
is a nonadversarial proceeding, the ALJ generally has an affirmative
obligation to develop the administrative record."). While not every
factual conflict in the record need be explicitly reconciled by the
ALJ, "crucial factors in any determination must be set forth with
sufficient specificity to enable [the reviewing court] to decide
whether the determination is supported by substantial evidence."
Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine

13

whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on three grounds, alleging that: (1) the ALJ's RFC determination failed to account for her specific limitations; (2) the ALJ failed to properly evaluate the opinion of her school psychologist; and (3) the ALJ's credibility determination was not supported by substantial evidence. See Docket # 6-1 at 9-19. Each argument is addressed below.

1. The ALJ's RFC Determination: Plaintiff first argues that an RFC limiting her to work requiring no more than level one reasoning ability fails to fully account for her borderline intellectual functioning. Id. at 9. The ALJ, she asserts, was required to make "specific findings" in regard to her non-exertional limitations, and

14

the "vague" reference to "work requiring no more than reasoning level one ability" does not satisfy that obligation. Id. at 10 (citing Isaacs v. Astrue, 2009 WL 528252, at *10 (W.D.N.Y. Mar. 2, 2009)). If the ALJ had properly specified her functional limitations according to the record below, plaintiff concludes, she would not qualify for competitive employment. Id. at 12. The Commissioner, in turn, asserts that the ALJ's reasoning level limitation sufficiently accounts for plaintiff's borderline intellectual functioning; the Dictionary of Occupational Titles ("DOT") defines level one reasoning as the ability to apply commonsense understanding to carry out simple one- or two-step instructions and deal with standardized situations with occasional or no variables in or from these situations encountered on the job. Docket # 9-1 at 9. Examples of this kind of work provided by the DOT include counting cows as they come off a truck, pasting labels on bottles, and tapping can lids with a stick. Id. Thus, according to the Commissioner, the ALJ's RFC assessment encompasses all of plaintiff's limitations. Id. at 10. Moreover, the Commissioner contends that the evidence of record – which indicates, inter alia, that plaintiff had a part-time job making pizza and routinely cared for her infant son – establishes that she is capable of performing tasks requiring level one reasoning. Id. at 11.

The Court finds that plaintiff's reliance on Isaacs is misplaced.

Contrary to plaintiff's assertion, see Docket # 6-1 at 10-12, the court in Isaacs did not find vague non-exertional limitations (e.g., claimant is limited to "level on reasoning") categorically insufficient to account for the non-exertional limitations posed by borderline intellectual functioning. Instead, in Isaacs, the court was concerned with an ALJ's use of the Medical Vocational Guidelines ("Grids")[1] to determine that the claimant had no non-exertional limitations. 2009 WL 528252, at *9. The Grids pertain only to exertional impairments and "are *not* designed to take account of significant non-exertional impairments." Id. (emphasis in original) (internal citation and quotation omitted). Accordingly, in Isaacs, the court held that, "where the claimant's ability to work is significantly diminished by non-exertional impairments, the Commissioner must present the testimony of a vocational expert regarding the existence of jobs in the national economy for a person with plaintiff's limitations." Id. (internal citation and quotation omitted). In other words, by relying solely on the Grids, which necessarily ignore non-exertional limitations, the ALJ in Isaacs failed to account for the claimant's borderline intellectual

---

[1] The Grids "take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy." Rosa v. Callahan, 160 F.3d 72, 78 (2d Cir. 1999) (internal quotation and citation omitted).

functioning. Id. at 10. Contrary to plaintiff's assertion, nothing in Isaacs compels this Court to reject the ALJ's level one reasoning limitation here; rather, it cautions the ALJ against relying on the Grids to assess a claimant's functional capacity when they demonstrate obvious non-exertional limitations.[2] 2009 WL 528252, at *9-10.

Nevertheless, plaintiff is correct in arguing that an RFC assessment requires specific findings. In particular, it must identify a claimant's functional limitations and assess their work-related abilities on a function-by-function basis. See 20 C.F.R. § 404.1545; see also SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). For mental limitations, this includes a claimant's ability to understand, remember, and carry out instructions, and respond appropriately to supervision. See Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (citations omitted). An ALJ's failure to provide a function-by-function analysis in their RFC assessment does not compel remand, however, so long as the RFC "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous . . . ." See

---

[2] Plaintiff also cites Kennerson v. Astrue, 2012 WL 3204055, at *16 (W.D.N.Y. Aug. 3, 2012) in support of her argument. However, like in Isaacs, the court in Kennerson remanded because the ALJ relied solely on the Grids to determine that a claimant was not disabled despite "overwhelming evidence" that she had non-exertional limitations. Id. at 15-16.

id. at 176-77; see also Diakogiannis v. Astrue, 975 F. Supp. 2d 299, 313-14 (W.D.N.Y. 2013) (collecting cases). Thus, "[a]lthough remand is not automatic, it would be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quotation and citation omitted).

Here, though the ALJ failed to provide a function-by-function analysis of plaintiff's limitations in his RFC,[3] he also clearly reviewed plaintiff's test scores, her IEP, her IQ score, and excerpts of the notes from her school psychologist. AR at 13. He considered and weighed the opinion of Dr. Ransom, who commented on plaintiff's limited intellectual capacity, impaired memory, and difficulty performing complex tasks, as well as the opinion of the State agency consultant. Id. Nevertheless, plaintiff argues that the ALJ failed to specifically consider her working memory, her ability to learn new information, and her ability to stay on task. Docket # 6-1 at 12. Plaintiff's contention, however, is belied by the ALJ's decision and the record below. Indeed, the ALJ's conclusion that plaintiff was "limited to work requiring no more than reasoning level one

---

[3] In its entirety, the RFC states that plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work requiring no more than reasoning level one ability." AR at 12.

18

ability" is consistent with the omitted limitations highlighted by plaintiff.  See Fernandez v. Colvin, 2016 WL 2946213, at *8 (W.D. Tex. 2016) (holding that, "[b]y limiting Plaintiff to simple, routine tasks with reasoning level one, the ALJ incorporated" problems with concentration, attention, memory, and intellectual functioning in an individual suffering from, among other things, borderline intellectual functioning).  After all, level one reasoning calls for the ability to "apply commonsense understanding to carry out simple one- or two-step instructions [and] [d]eal with standard situations with occasional or no variables in or from these situations encountered on the job," and includes jobs like counting cows as they come off a truck and pasting labels on bottles.  Docket # 9-1 at 9. These limitations are consistent with the ALJ's evaluation of the record and relevant medical opinions, which revealed that plaintiff's borderline intellectual functioning made it difficult for her to concentrate and retain new information.  AR at 13.  The limitations posed by level one reasoning also comport with the ALJ's finding that plaintiff had moderate difficulty with concentration, persistence, and pace; moderate limitations in her ability to understand and carry out simple instructions; no restrictions socializing with others; and limited difficulty performing her activities of daily living, which included self-care and caring for her infant son.  AR at 11-12. Accordingly, while the ALJ failed to conduct a function-by-function

analysis that provided specific findings as to plaintiff's mental limitations, remand is inappropriate because the ALJ assessed an RFC that provided an adequate basis for judicial review. See Cichocki v. Astrue, 729 F.3d 172, 178 (2d Cir. 2013); see also Diakogiannis, 975 F. Supp. 2d at 315-16 (affirming where ALJ failed to conduct a function-by-function analysis of the claimant's mental capabilities but considered the claimant's functional capacity and evidence of record).

    2. The Opinion of Plaintiff's School Psychologist: Plaintiff next argues that the ALJ's failure to explain the weight he assigned to the opinion of her school psychologist, Gary Kleiman, constituted error. Docket # 6-1 at 13. According to plaintiff, Kleiman is an acceptable medical source under the relevant regulations and provided a rigorous analysis of plaintiff's various intellectual deficiencies. Id. at 14. The ALJ's failure to acknowledge and provide an explanation for the weight assigned to Kleiman's opinion, plaintiff argues, falls short of his obligation to "evaluate every medical opinion [he] receive[s]." Id. (citing 20 C.F.R. § 404.1527(c)). In response, the Commissioner contends that Kleiman is not an "accepted medical source" or a treating physician. Docket # 9-1 at 12. At best, the Commissioner argues, he is an "other source" under the regulations, entitled to little deference from the ALJ. Id. Moreover, while the Commissioner acknowledges that the ALJ failed to articulate the weight

he accorded to Kleiman's report, she reminds this Court that "no such slavish recitation of each and every factor [in 20 C.F.R. § 416.927(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear." Id. at 14 (quoting Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order)). Regardless, the Commissioner contends, the ALJ's RFC assessment is consistent with Kleiman's opinion. Id. at 14.

A review of the record and the relevant regulations reveals that plaintiff is correct; the regulations make clear that, "for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only," school psychologists are "acceptable medical sources." 20 C.F.R. § 416.913(a)(2); see also Porter v. Colvin, 2016 WL 1084162, at *5 n.3 (W.D.N.Y. March 21, 2016). While the Commissioner urges the Court to interpret this language to mean that school psychologists are only acceptable medical sources for establishing borderline intellectual functioning and not for commenting on the functional impact of the impairment, see Docket # 15 at 1-2, that interpretation must fail. Indeed, in the very same regulation qualifying school psychologists as acceptable medical sources, the Social Security Administration elaborates that an ALJ must consider statements from acceptable medical sources regarding a claimant's "ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers,

21

and work pressures in a work setting . . . ."  20 C.F.R. §
416.913(c)(2).  The regulations further clarify that opinions from
acceptable medical sources are statements "that reflect judgments
about the nature and severity of [a claimant's] impairments, including
[their] symptoms, diagnosis and prognosis, what [they] can still do
despite impairment(s), and [their] physical or mental restrictions."
20 C.F.R. § 416.927(a)(2).  The intent of the regulations is clear,
and the cabined construction urged by the Commissioner – which turns
a school psychologist's holistic evaluation into a binary verdict
– ignores the reality of mental healthcare practice and the context
in which the regulation was promulgated.  It defies both logic and
the regulatory scheme created by the Social Security Administration
that a regulation explicitly recognizing the expertise of school
psychologists in establishing borderline intellectual functioning
would simultaneously mandate that the findings and observations
informing that opinion should be ignored or truncated.  Accordingly,
the question that remains before this Court is whether the ALJ's
failure to articulate the weight he accorded to Kleiman's opinion,
which serves as an acceptable medical opinion, constitutes error.

As a preliminary matter, I must determine the proper deference
owed to Kleiman's opinion.  While he is certainly an acceptable
medical source, he is not a treating physician and his opinion is
not entitled to controlling weight under the Second Circuit's treating

22

physician rule.  Indeed, as best the Court can discern, Kleiman met

with plaintiff on one occasion to prepare an updated assessment of

her intellectual functioning for her school and, apparently, an adult

educational and vocational program.  AR at 283.  This falls far short

of the requirements for establishing a treating source relationship

under the regulations.  See 20 C.F.R. § 416.902 ("Treating source

means your own . . . psychologist . . . who provides you, or has provided

you, with medical treatment or evaluation and who has, or has had,

an ongoing treatment relationship with you.");  see also Connell L.

v. Astrue, 2010 WL 3185859, at *9 (E.D. Cal. Aug. 11, 2010) (finding

one-time  report  from  school  psychologist  regarding  claimant's

academic  achievement,  cognitive  ability,  adaptive  skills,  and

behavioral   strengths   insufficient   to   establish   treating

relationship).  Nevertheless, the ALJ was required to evaluate and

explain the weight he assigned to Kleiman's medical opinion based

on  the  length,  frequency,  and  nature  of  his  relationship  with

plaintiff; the supportability of his findings; the consistency of

his opinion with the record; his specialized skill; and other relevant

factors.  See 20 C.F.R. § 416.927(c);  see also Felton v. Astrue, 2010

WL 3880628, at **5 (W.D.N.Y. Sept. 10, 2010) (remanding for ALJ's

failure  to  properly  weigh  "various  medical  opinions  of  record,"

including claimant's school psychologist).

Here, the ALJ failed to properly evaluate Kleiman's opinion

according to these guidelines. To be sure, "the ALJ is not obligated
to reconcile explicitly every conflicting shred of medical
testimony," but, at a minimum, the ALJ must explain why a medical
source opinion was not adopted in full where the ALJ's RFC assessment
conflicts with that opinion. See Dioguardi v. Comm'r of Soc. Sec.,
445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (quotations omitted).
"Accordingly, an ALJ who chooses to adopt only portions of a medical
opinion must explain his or her decision to reject the remaining
portions." Raymer v. Colvin, 2015 WL 5032669, at *5 (W.D.N.Y. Aug.
25, 2015) (citations omitted); see also Caternolo v. Astrue, 2013
WL 1819264, at *9 (W.D.N.Y. April 29, 2013) ("[I]t is a fundamental
tenet of Social Security law that an ALJ cannot pick and choose only
parts of a medical opinion that support his determination." (citations
omitted). While the Commissioner urges this Court to infer that the
ALJ found that Kleiman's opinion would not alter his RFC assessment,
see Docket # 9-1 at 14-15, such an inference would be improper.
Indeed, the ALJ's limited discussion of Kleiman's opinion[4] makes it

---

[4] While the ALJ acknowledged that Kleiman's report exists, his
discussion of it fails to capture the extent of the mental limitations
Kleiman observed. In total and without explaining that Kleiman was
an acceptable medical source, the ALJ stated that Kleiman found
plaintiff's "attention to task was good, but that she struggled at
times with concentration, especially on tasks that required much
retention of information," that plaintiff "was able to work diligently
and with sustained effort," and that plaintiff "was noted to be able
to follow oral and written procedures that are clear and concise."
AR at 13.

24

impossible for the Court to assess whether he considered all the limitations observed by Kleiman and rejected them based on the guidelines provided by the regulations, or whether he recognized the more favorable parts of Kleiman's opinion and ignored the rest. See Raymer, 2015 WL 5032669, at *6 ("Rather, the ALJ completely ignored in his decision some of the limitations identified by [the medical source statement], and I am unable to determine whether the ALJ considered them or overlooked them altogether." (citation omitted)); see also Dioguardi, 445 F. Supp. 2d at 298 ("With no explanation provided, it is not possible for the Court to know why . . . the ALJ chose to disregard the evidence that was more favorable to plaintiff's claim.").

Moreover, the ALJ's failure to properly evaluate Kleiman's opinion is not harmless error. A failure to explain the weight assigned to an acceptable medical source is harmless where, unlike here, the medical opinion is essentially consistent with the other medical evidence in the record. See Skibinski v. Astrue, 2010 WL 986524, at *4 (W.D.N.Y. March 17, 2010). In the instant case, Kleiman's opinion is significantly more restrictive. Kleiman observed, for example, that plaintiff: had "significant weaknesses within the deficient range" in her auditory processing skills, short term memory development, expressive language skills, and numerical reasoning abilities; had "quite impaired" visual perceptual

25

abilities; had "definite weaknesses in the areas of visual transfer and discrimination skills, along with spatial relationship problem solving skills" and inductive reasoning skills; had "very low" working memory and processing speed skills; had "significant difficulties holding on to information in her short term memory long enough to process it and express her understanding" and would require "ample time to process new information"; and required "extensive repetition, as well as information given in a more concrete manner to check on her understanding of the material, particularly because her expressive language skills [were] also very low." AR at 282. To compare, consultative examiner Dr. Ransom opined that plaintiff had only a mildly impaired memory and had no difficulty: following and understanding directions and instructions; maintaining concentration for simple tasks; and learning simple new tasks. AR at 360-61. The impact of the ALJ's failure to properly weigh Kleiman's opinion becomes clear after reviewing the testimony of the VE, who stated that an individual who required the repetition of instructions and information – a non-exertional limitation reasonably within the scope of Kleiman's opinion - would be disqualified from holding competitive employment. AR at 38.

While "[i]t may well be that the ALJ here had good reasons to give less weight" to Kleiman's opinion, "it is not the role of a reviewing court to speculate what those reasons might be or to conjure

26

up supporting explanations on its own accord." Maenza v. Colvin, 2016 WL 1247210, at *13 (W.D.N.Y. March 24, 2016). Accordingly, remand is required so that the ALJ may properly evaluate and explain the weight assigned to Kleiman's medical source opinion.

The ALJ's Credibility Determination: Lastly, plaintiff argues that the ALJ's credibility determination lacks support from substantial evidence in the record. Docket # 6-1 at 16 (quoting AR at 14). Because I am remanding this matter so that the ALJ may properly evaluate plaintiff's school psychologist's opinion and potentially re-assess his RFC determination, it would be premature for this Court to weigh in on plaintiff's credibility argument. See Balodis v. Leavitt, 704 F. Supp. 2d 255, 268 n.14 (E.D.N.Y. 2010) ("Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility."). That being said, "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations and quotations omitted). Accordingly, to the extent it is necessary, the ALJ should re-evaluate his credibility determination on remand.

27

## Conclusion

The Commissioner's motion for judgment on the pleadings (Docket # 9) is **denied**, and plaintiff's motion for judgment on the pleadings (Docket # 6) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   September 30, 2016
         Rochester, New York

28